IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. RDB-21-0334 |
| | : | |
| WILSON NUYILA TITA, <u>et al.</u>, | : | |
| | : | |
| Defendants. | : | |

...oOo...

### GOVERNMENT'S REPLY TO SENTENCING MEMORANDUM OF ERIC NJI

The United States of America, by its undersigned attorneys, submits this reply to the Sentencing Memorandum of Eric Nji.

### INTRODUCTION

On May 6, 2022, at the conclusion of a two-week trial, the jury found the defendant Nji and his co-defendants, Wilson Tita and Wilson Fonguh, guilty of conspiracy in violation of 18 U.S.C. § 371, transporting firearms with obliterated serial numbers in violation of 18 U.S.C. § 922(k) and smuggling in violation of 18 U.S.C. § 554(a).[1]

The defendant, along with Tita, Fonguh and seven other individuals who participated in the conspiracy, are awaiting sentencing before this Court. Defendant Nji, whose hearing is scheduled for 11 a.m on March 21, 2023, will be the first of the ten co-conspirators to be sentenced.

### ARGUMENT

I.    The Advisory Guidelines Calculation.

---

[1] The jury acquitted the defendants on charges of violating the Arms Export Act (22 U.S.C. § 2778) and violating the Export Control Reform Act (50 U.S.C. § 4819).

1

The government agrees with the U.S. Probation Office that the defendant's criminal history is a Category I and that the applicable advisory guideline calculations are as follows:

| | |
|---|---|
| 12 | base offense level (USSG §2K2.1(a)(7)) |
| +6 | more than 28 firearms (USSG §2K2.1(b)(1)(C)) |
| +4 | trafficking in firearms (USSG §2K2.1(b)(5)) |
| +4 | firearms to be transported out of the United States (USSG §2K2.1(b)(6)) |
| +2 | obstruction of justice (USSG §3C1.1) |
| 28 | total |

The defendant's Criminal History Category is I. His final advisory guideline range, therefore, is 78-97 months.

The defendant objects to this calculation, specifically disputing the application of the obstruction of justice enhancement (U.S.S.G. §3C1.1), the six level enhancement for more than 28 firearms (U.S.S.G. §2K2.1(b)(1)(C)) and the four level increase for transportation of the firearms outside of the United States (U.S.S.G. §2K2.1(b)(6)). The defendant further claims that he should receive a reduction for acceptance of responsibility (U.S.S.G. §3E1.1). Def. Sen. Mem. at 4-5. ECF 169.

As set forth below, each of the defendant's objections is meritless.

A.   <u>The Obstruction of Justice Enhancement is Applicable.</u>

Section 3C1.1 provides that a two-level enhancement is appropriate where "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct." U.S.S.G. §3C1.1. When the enhancement is based on a defendant's trial

testimony, "[t]here are three elements necessary to impose a two-level enhancement for obstruction of justice based on the defendant's perjurious testimony: the sentencing court must find that the defendant "(1) gave false testimony; (2) concerning a material matter; (3) with willful intent to deceive...." *United States v. Perez*, 661 F.3d 189, 192 (4th Cir. 2011). In other words, if the false testimony regards a material matter and there is no suggestion that it "was the result of confusion, mistake, or faulty memory," the enhancement should apply. *Id.* at 193.

Applying this standard, the Fourth Circuit has regularly upheld application of the enhancement where, as here, a defendant took the stand and lied about having the requisite knowledge. *See United States v. Qazah*, 810 F.3d 879, 891 (4th Cir. 2015) (upholding perjury enhancement where defendant lied about knowing cigarettes were stolen, which was a central issue in the case); *United States v. Lugo*, 131 F. App'x 901, 910 (4th Cir. 2005) (upholding application of enhancement where defendant's testimony falsely claiming limited involvement in scheme was "offered to attenuate her involvement in Katz's operation, and by extension her culpability"). The Fourth Circuit has further noted that "[d]istrict courts hold an especial advantage in fact finding where the sentencing enhancement is based upon testimony or trial proceedings that they have personally observed." *United States v. Andrews*, 808 F.3d 964, 969 (4th Cir. 2015).

One of the defendant's main defenses at trial was that he did not know that the firearms charged in the Superseding Indictment had obliterated serial numbers, and therefore, he did not have the requisite *mens rea* to violate 18 U.S.C. §§ 371 (conspiracy), 18 U.S.C. § 554(a) (smuggling), or 18 U.S.C. § 922(k) (transporting firearm with obliterate serial number). The defendant testified that he worked in the small basement "lab" with co-conspirator Muma, whose job it was to grind off the serial numbers, but that he did not know what it was that Muma did in

3

the basement. Portions of Trial Transcript Vol. VI, attached as Exhibit 1, at 41, 50. Nji further testified that he never heard or saw the grinding machine and that he did not know anything about serial numbers on firearms. *Id.* at 11, 16, 52, and 55.

Given its verdict, it is clear that the jury did not believe Nji's testimony that he did not know about the obliteration of the serial numbers. That false testimony was material, since the jury had to find that the defendant acted knowingly with respect to all three counts of conviction. Moreover, there was no indication that the defendant was confused, mistaken or had a faulty memory when he testified at trial.   For these reasons, a two level increase for obstruction of justice is fully warranted.

    B. Pursuant to U.S.S.G. §2K2.1(b)(1)(C), the Guideline Calculation Should Include an Increase of Six Levels.

The evidence at trial established that the conspirators secreted 28 firearms with obliterated serial numbers in the shipping container that they sent out of the Port of Baltimore in January of 2019.  U.S.S.G. §2K2.1(b)(1)(C) provides for an increase of six levels, because the number of firearms involved in the offense was more than 25 and less than 99.

The defendant claims that the enhancement should not apply, because "[i]n paragraph 29 of the presentence report it is *admitted* that the government did not prove that Mr. Nji knew that serial numbers on all 28 firearms had been obliterated." Def. Sen Mem. at 4 (emphasis added). That assertion is patently false.  Paragraph 29 of the presentence report is part of the *defendant's* statement of facts that he provided to the probation officer; a statement of facts that is not accurate and to which the government objected in its response to the draft presentence report.

In any event, the proof at trial unequivocally established that there were 28 firearms with obliterated serial numbers that were involved in the offenses.  Those firearms were all introduced

4

into evidence and identified as having been recovered from the shipping container. Count Four of the Superseding Indictment charged the transportation of the firearms with obliterated serial numbers in violation of 18 U.S.C. § 922(k) and specifically listed all 28 firearms in the count itself.  Count Five, which charged smuggling in violation of 18 U.S.C. § 554(a), also specifically referred to "[t]wenty-eight firearms which had the manufacture's serial number removed, obliterated, and altered…" as the items intended for export in violation of the law.  The jury returned verdicts of guilty verdict as to those counts, as well as to the charge of conspiracy to commit those offenses in Count One.  Plainly, the offenses for which the defendant was convicted "involved" the 28 firearms.

The defendant also argues that the enhancement should not apply on the ground that the government allegedly failed to prove the exact number of firearms that were "known by Mr. Nji." Def. Sen. Mem. at 4.  The defendant cites no authority for this alleged proof requirement, nor can he.  The government need only prove, and it did, how many firearms were involved in the offenses for which the jury found him guilty in order for the enhancement to apply.  U.S.S.G. § 2K2.1(b)(1)(Directing an increase "[i]f the offense *involved* three or more firearms)(emphasis added).  The defendant is accountable for all 28 firearms, because he was convicted of the substantive offenses of transporting those firearms and smuggling them. Obviously, those offenses involved the firearms.

The defendant is also accountable for all of the firearms because he was a member of the conspiracy to transport and smuggle the weapons. As such, the firearms were a part of the relevant conduct undertaken both is furtherance of, and within the scope of, the conspiracy. It was reasonably foreseeable that there would be multiple firearms with obliterated serial numbers in the shipment. *See* U.S.S.G. § 1B1.3(a)(1)(B)(Relevant Conduct). Whether the defendant

himself knew the exact number of the firearms with obliterated serial numbers is simply not relevant.

    C.  The Defendant Trafficked in Firearms Within the Meaning of U.S.S.G. § 2K2.1(b)(5).

The defendant argues that he should not receive a four-level enhancement for trafficking in firearms, because the presentence report allegedly did not identify a factual basis to support that conclusion. Def. Sen. Mem. at 5. The defendant is incorrect. The evidence at trial, as summarized in the statement of facts set forth at paragraphs 7–25 in the presentence report, established that the defendant engaged in trafficking within the meaning of U.S.S.G. § 2K.2.1(b)(5).

U.S.S.G. § 2K.2.1(b)(5) states that "[i]f the defendant engaged in the trafficking of firearms, increase by 4 levels." The commentary to U.S.S.G. § 2K2.1(b)(5) explains the applicability of the subsection as follows:

> (A) Subsection (b)(5) applies, regardless of whether anything of value was exchanged, if the defendant –
>
>     (i)    transported, transferred, or otherwise disposed of two or more firearms to another individual, or received two or more firearms with the intent to transport, transfer, or otherwise dispose of firearms to another individual; and
>
>     (ii)   knew or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm to an individual-
>
>         (I)   whose possession or receipt of the firearm would be unlawful; or
>
>         (II)  who intended to use or dispose of the firearm unlawfully.

Application Note 13, U.S.S.G. § 2K2.1.

Here, the offenses involved the transport of more than two firearms to another, namely Mr. Bangarie, the freight forwarder who was a member of the conspiracy, so that he could oversee the actual shipment of the firearms out of the country in violation of United States law. As the defendant testified, Mr. Bangarie, Mr. Akem and Mr. St. Michael "were the one [sic] handling the shipments."  Exhibit 1 at 38.  These facts establish that the defendant engaged in the trafficking of firearms within the meaning of U.S.S.G. § 2K2.1.

    D.  **The Defendant Has Not Accepted Responsibility for His Criminal Conduct Within the Meaning of U.S.S.G. § 3E1.1.**

The defendant's last challenge to the guideline calculation is that he should receive credit for acceptance of responsibility under U.S.S.G. § 3E1.1. According to the defendant, the fact that he denied knowing that the serial numbers were obliterated on the firearms does not equate with a denial of responsibility. Def. Sen. Mem. at 4-5.[2]  As with his other guideline objections, the defendant's position is baseless.

In order to accept responsibility within the meaning of U.S.S.G. § 3E1.1, a defendant must "truthfully admit[] the conduct comprising the offense(s) of conviction, and truthfully admit[] or not falsely deny[] any additional relevant conduct for which the defendant is accountable under § 1B1.3(Relevant Conduct)." Application Note 1(A), U.S.S.G. § 3E1.1. The adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilts and expresses remorse." Application Note 2, U.S.S.G. § 3E1.1.

---

[2] The defendant also states that he "did not deny his conviction…" Def. Sen. Mem. at 5. Whether a defendant admits or denies the fact that a jury actually found him guilty is irrelevant to the analysis of acceptance of responsibility under U.S.S.G. § 3E1.1.

The defendant denied at trial, and continues to deny, that he had the requisite *mens rea* to commit the offenses for which he has been convicted. He has not even admitted guilt and accepted remorse following his trial. And even if he had done so, the adjustment still would not apply. *Id.* The defendant is not entitled to any reduction for acceptance of responsibility under U.S.S.G. § 3C1.1.

II. <u>The Section 3553(a) Factors Support a Sentence of 85 Months of Imprisonment.</u>

The sentencing factors in 18 U.S.C. § 3553(a) strongly support the imposition of an advisory guideline sentence of 85 months. Such a sentence would be sufficient, but not greater than necessary, to achieve the goals of sentencing set forth in 18 U.S.C. § 3553(a)(2).

A. <u>The Nature and Circumstances of the Offense.</u>

The defendant actively participated in an extensive international arms smuggling operation for a period of more than 1 ½ years. He contributed his own funds and many hours of his time to advance the goal of the operation, which was to secretly provide deadly weapons, ammunition and other military-type items to separatists fighting against the Government of Cameroon. This criminal scheme was serious and warrants the imposition of an equally serious punishment.

The seriousness of the defendant's conduct is starkly reflected in just the inventory alone of the items found in the shipping container. Quite literally, the container contained an arsenal. There were 38 firearms, 28 of which had the obliterated serial numbers. The guns included sniper rifles, SKS assault rifles (some with bayonets), other rifles and several handguns. There were 44 high-capacity magazines, two rifle scopes and over 35,000 rounds of ammunition. *See* Attachments 1 and 2 of the Superseding Indictment. ECF 44. There was also pepper spray,

knives, body armor, gas masks, ammunition reloading tools and equipment, military clothing, boots and other military-type supplies.

In addition, the conspirators had shipped arms and other items to Cameroon on at least two other occasions. Although the exact inventory of the items in those two shipments is not known, it is reasonable to conclude that the items, which were sent in furtherance of the conspiracy, included similar firearms, ammunition and military supplies.

In spite of the very serious nature of his crimes, the defendant appears to suggest that he should receive a lighter sentence, because he was motivated to commit those crimes out of concern for the safety of Southern Cameroonians ("Anglophones") in Cameroon. The defendant essentially posits himself as a force of good against the evil actions of the government forces in Cameroon. He argues that those forces have committed many atrocities against the Southern Cameroonians and even attached to his memorandum gruesome photographs of individuals purportedly killed by those forces.

There is no dispute that the ongoing violence in Cameroon has included atrocious conduct and has cost many lives. But, the atrocities have not been not committed *only* by the government forces, as the defendant would have this Court believe. The U.S. Department of State Human Rights Report for Cameroon for 2018 specifically found that:

> The sociopolitical crisis that began in the Northwest and Southwest Regions in late 2016 over perceived marginalization developed into an armed conflict between government forces and separatist groups. The conflict resulted in serious human rights violations and abuses by government forces *and Anglophone separatists*. Human rights issues included arbitrary and unlawful killings by security forces *as well as armed Anglophone separatists*; forced disappearances by security forces, Boko Haram, *and separatists*; torture by security forces *and Anglophone separatists* …

https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/cameroon

(emphasis added). The Department of State's Human Rights Report for 2019 reached a similar

conclusion, reporting that "Anglophone separatists attacked and killed members of defense and security forces, as well as civilians considered loyal to the central government. For example, during the night of April 23 and the morning of April 24 in Muyuka, Southwest Region, separatist fighters decapitated and dismembered gendarme Adam Assana and scattered his body parts on the highway." https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/cameroon.

Notably, the defendant and his co-conspirators were smuggling weapons and ammunition to the Anglophones during that same time period that the Anglophones were committing their own atrocities. Clearly, the motivation behind the defendant's criminal conduct was not to "better the Cameroon community," as he claims. Def. Sen. Mem. at 4. Rather, he was motivated by a desire to arm one side of a bitter and violent conflict in which *both* sides engaged in atrocities. That desire is no excuse for engaging in extensive criminal conduct on U.S. soil nor is it a legitimate mitigating factor.

The defendant also claims that he did not know that his conduct was illegal. Def. Sen. Mem. at 3-4. The jury obviously rejected that claim, finding that the defendant acted knowingly in committing his crimes. It is axiomatic that a defendant's alleged ignorance of the law, even if true, has no impact whatsoever on the severity of the defendant's criminal conduct. The defendant knowingly and intentionally engaged in multiple criminal acts over a lengthy period of time. His conduct warrants a serious sentence.

B.    The History and Characteristics of the Defendant.

Mr. Nji is a highly educated and financially successful adult. He immigrated to this country, became a naturalized citizen, obtained a master's degree in accounting, and is gainfully employed in the cyber security profession. He owns his own home and is raising a family. The

defendant allegedly has engaged in a variety of charitable and humanitarian aid efforts to support the Anglophone community in Cameroon.

There is nothing about that history or the defendant's characteristics that sets him apart from the average non-violent offender. Scores of defendants who engage in non-violent crimes are educated, have a home and family, and maintain steady employment. As for the defendant's charitable activities, while certainly laudable if true, such activities are not unusual.[3] Many of the defendants in non-violent cases who come before this Court and other courts are, but for their criminal conduct, solid citizens who routinely engage in various community and charitable activities. Overall, the defendant is a typical non-violent offender with no identifiable mitigating characteristics.

C.  Disparity.

18 U.S.C. § 3553(a)(6) states that a sentencing court shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." That sentencing factor is particularly critical in this case, because the defendant is the first of the ten members of the conspiracy who are scheduled to appear before this Court for sentencing over the next two months.

The ten defendants all have a similar record of no criminal history. They all have been found guilty of the same conspiracy. Seven of the ten conspirators entered guilty pleas for their roles in the arms smuggling operation. Three out of those seven defendants entered into cooperation plea agreements and testified at the trial of the remaining three conspirators, Nji, Tita and Fonguh. The defendants, therefore, are similarly situated in terms of their participation

---

[3] Other than his self-serving representations, the defendant has offered no evidence to support his claims of charitable activities.

in the criminal offenses, but differently situated with respect to their acceptance of responsibility, whether they were cooperators or not, and whether they went to trial or testified.

Defendant Nji and co-defendant Fonguh have the same situational status for purposes of sentencing. Both went to trial, testified falsely in their own defense, and were convicted on the same three counts of conspiracy, transportation of a firearm with obliterated serial number, and smuggling. Their sentences should be the most serious of the ten defendants. Defendant Tita, who went to trial but did not testify, should receive a slightly lower sentence. The four defendants who pled guilty but did not have cooperation agreements should receive sentences that are less than Tita's, and the status of the three defendants who did cooperate should be the lowest.

The applicable advisory guidelines echo this structure. The government has calculated that the final guideline offense level for defendants Nji and Fonguh should be 28. For defendant Tita, the final level should be 26. The final level for the four non-cooperating defendants should be 23, and the final level for the three cooperating defendants should be no more than 21.

The government recommends that the Court impose an advisory guideline sentence of 85 months for defendant Nji.  Such a sentence, which falls at the middle of the final guideline range of 78 to 97 months, would ensure that there will be no unwarranted disparity among the various defendants in this case, as well as among similarly situated defendants generally.

D.      The Need for Deterrence, Promote Respect for the Law and Impose Just Punishment.

A sentence of 85 months in prison will promote respect for the law, deter other potential offenders and impose a just punishment for a serious crime.  18 U.S.C. § 3553(a)(2)(A) and (B). Imposing such a sentence on this defendant, who engaged in a carefully devised scheme to secretly ship arms overseas multiple times over a substantial period of time, will certainly

promote respect for the law. Moreover, such a guideline sentence will send a strong message to the community at large, and especially to the large Cameroonian community in the United States, that this type of criminal conduct, regardless of the motivation, will not be tolerated and will be met with a serious penalty. *United States v. Milo*, 506 F.3d 71 (1st Cir. 2007) ("[T]he lack of any real prison sentence for what is a major crime would be very hard for the public to understand, and public confidence in enforcement of the law is itself a value").

## CONCLUSION

A sentence of imprisonment for 85 months would fulfill the sentencing goals set forth in 18 U.S.C. § 3553. For more than 1 ½ years, the defendant regularly participated in the execution of an extensive smuggling scheme in which members of the conspiracy repeatedly shipped firearms, ammunition, rifle scopes and other equipment to separatists fighting the Cameroonian government. The recommended sentence would properly reflect the "seriousness of the offense, [] promote respect for the law, and [] provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A), thereby accomplishing one of the fundamental goals of sentencing.

For these reasons, and for reasons to be presented further at the sentencing hearing, the government respectfully requests that this Court impose a sentence of 85 months of

imprisonment and a period of supervised release of three years.

                              Respectfully submitted,

                              Erek L. Barron
                              United States Attorney

By:  _____
                              Kathleen O. Gavin
                              Assistant United States Attorney
                              36 South Charles Street
                              Fourth Floor
                              Baltimore, Maryland 21201
                              (410) 209-4800

                              *Filed via CM/ECF*